STATE, Appellant, v. J. C. PENNEY COMPANY, Respondent.

*No. 173. Argued September 10, 1970.—Decided October 9, 1970.*
(Also reported in 179 N. W. 2d 641.)

For the appellant the cause was argued by *James D. Jeffries,* assistant attorney general, with whom on the briefs was *Robert W. Warren,* attorney general.

For the respondent there was a brief by *Orr, Isaksen, Werner, Lathrop & Heaney,* attorneys, and *Charles W. Totto* of counsel, all of Madison, and oral argument by *San W. Orr.*

A brief amicus curiae was filed by *Joseph F. Preloznik,* attorney, and *Charles H. Johnson* of counsel, both of Madison, for Wisconsin Judicare.

WILKIE, J. Two issues are presented on this appeal:

1. Does respondent's one and one-half percent monthly charge on the declining unpaid balance of its revolving charge account constitute forbearance of money, goods or things in action within the meaning of sec. 138.05 (1), Stats.?

2. If respondent's revolving charge account does violate sec. 138.05 (1), Stats., should an injunction be issued as requested by the state against the respondent?

*I. The applicability of sec. 138.05 (1), Stats.*

Sec. 138.05 (1), Stats., provides, in pertinent part, that no person shall:

". . . directly or indirectly, contract for, take or receive in money, goods or things in action, or in any other way, any greater sum or any greater value, for the loan or forbearance of money, goods or things in action, than:

"(a) At the rate of $12 upon $100 for one year computed upon the declining principal balance of the loan or forbearance; . . ."

In *Zang v. Schumann,*[1] this court recognized the basic elements which are essential to constitute a usurious transaction:

". . . The law on this point is well summarized in 55 Am. Jur., Usury, p. 331, sec. 12, as follows:

" 'The definition of usury imports the existence of certain essential elements generally enumerated as (1) a

---

[1] (1952), 262 Wis. 570, 579, 55 N. W. 2d 864.

loan or forbearance, either express or implied, of money, or of something circulating as such; (2) an understanding between the parties that the principal shall be repayable absolutely; (3) the exaction of a greater profit than is allowed by law; and (4) an intention to violate the law. The presence of these elements infallibly indicates usury irrespective of the form in which the parties put the transaction; on the other hand, the absence of any one of them conclusively refutes the claim of usurious practice. In order that a transaction be considered usurious, these elements must exist at the inception of the contract, *since a contract which in its inception is unaffected by usury can never be invalidated by any subsequent usurious transaction. It is the agreement to exact and pay usurious interest, and not the performance of the agreement, which renders it usurious.* The test to be applied in any given case is whether the contract, if performed according to its terms, would result in producing to the lender a rate of interest greater than is allowed by law, and whether such result was intended.' (Emphasis supplied.)"

There is no question here as to requirements (2) and (3). The principal, the cash price of goods received, is "repayable absolutely," and a rate of one and one-half percent equals 18 percent yearly, a rate which is plainly higher than that allowed under sec. 138.05 (1) (a), Stats.

It is on requirements (1), an express or implied loan or forbearance of money, and (4), intent, that the parties are in conflict. The major dispute is over whether the "Penney Charge Account Agreement" (hereinafter referred to as the Agreement) is in fact a forbearance as the term is used in sec. 138.05 (1), Stats. Both parties seem to agree it is not an actual loan, and the trial court specifically found "There is no loan as such."

### Is there forbearance?

The trial court determined the Agreement was in fact a forbearance. It concluded that when a sale is completed, there results a debt created to pay money, and that the

vendor and purchaser then assume the relation of debtor and creditor, citing *Trempealeau County v. State* [2] for the proposition that money due upon a contract is included in the legal term "debt," concluding:

". . . In substance, it would seem to mean nothing more as between a debtor and creditor, than an agreement by the creditor not to attempt collection of the debt for an agreed length of time."

It then went on to note that although the Agreement here involved does not expressly provide for such forbearance on the part of defendant, it is clearly implied, and that a promise to forbear may be implied,[3] as is stated by sec. 138.05 (1), Stats.

Respondent vigorously contends, however, that the Agreement in no way constitutes a forbearance within the meaning of the term as used in sec. 138.05 (1), Stats. In support of its position it cites the definition found in Black's Law Dictionary (4th ed.):

" 'Within usury law, [forbearance] signifies contractual obligation of lender or creditor *to refrain,* during given period of time, from requiring borrower or debtor to repay loan or debt *then due and payable.*' [Emphasis by respondent.] . . .
"The trial court quoted Black's definition . . . but omitted the words we have emphasized in the above quotation."

Respondent then contends that the trial court erred in applying the term forbearance to its agreement. Respondent argues that to constitute forbearance, an agreement must extend the maturity date of a debt in existence at the time the extension agreement is entered into. Respondent contends that "there is no debt payable at the time of purchase" but under the Agreement the decision to charge the purchase "creates the debt that is

---

[2] (1952), 260 Wis. 602, 605, 51 N. W. 2d 499.

[3] 1 Williston, *Contracts* (3d ed.), pp. 566, 569, sec. 135. *See also: W. G. Taylor Co. v. Bannerman* (1904), 120 Wis. 189, 97 N. W. 918.

payable under the credit terms of the plan agreement. There simply is no forbearance because of the absence of a prior debt."

This argument is without substance. Clearly the trial court is correct when it concludes that the purchase of goods creates an obligation to pay for them. Respondent cannot dispute this. Further, upon the failure to pay for the goods received at the time of purchase, a debt is created and a relationship of debtor-creditor created. Then can the mere fact that prior to the purchase the parties agreed to a financing plan change this basic legal relationship? [4] Here, the prior agreement as to the terms of financing really has no effect on the actual forbearance. In the Agreement the parties merely agree to forbear; the actual forbearance occurs after the purchase when the purchaser does not pay within thirty days. Another theory, as the trial court seemed to indicate, is that the creation of the debt (purchase), and the effective agreement to forbear from immediate collection are "coterminous." As described, the customer selects his purchase and then is asked "Is this cash or charge?" When the customer says "Charge," the Agreement goes into effect. In substance, the customer is making a new contract with respondent every time he makes a new purchase, and the signing of each sales slip seems to indicate this. The customer at each purchase agrees to apply the terms of the Agreement to that particular transaction. And this occurs contemporaneously with the receipt of the goods, as in any sales transaction. To attempt to decide which occurs first is to engage in a "chicken-or-the-egg" discussion, although it is clear that until delivery there is no obligation to pay. To sustain respondent's conten-

---

[4] *See Dry Dock Bank v. American Life Ins. & Trust Co.* (1850), 3 N. Y. 344, heavily relied on by defendant for the proposition that usury statutes do not cover "time-price" sales, *infra*. There the court stated: ". . . Upon the sale of property on time, the purchase money becomes a debt which is forborne for the period limited by the credit." *Id.* at page 358.

tion that the method of handling all the details changes the effect of the transaction is merely to sustain form over substance. As the Nebraska court stated in *Lloyd v. Gutgsell*,[5] in discussing a conditional sales contract for a mobile home:

". . . When we look through the form, can we come to any other conclusion but the one that the difference between the price and what the buyer finally pays is the cost of carrying the balance of the cash price? To put it another way, the charge is for the forbearance to collect the full cash price, or for the use of money."

It is clear that if the Agreement stated (as do some credit card contracts) in effect, "This debt becomes due and payable in thirty days from the date of purchase"[6] and then provided for additional charges for payment after thirty days, respondent's argument would have no merit, since the Agreement would then state that a debt was due and payable, and the charge would be for an extension of an existing debt, and definitely within respondent's interpretation of the term "forbearance." But, the Penney Agreement does not so provide. Does this failure to include this statement make the Penney Agreement any different in effect from other such credit transactions? No. In substance they are the same. The Agreement does provide:

"2. I will, within one month after each monthly billing date, make an installment payment in accordance with your then current payment schedule . . . ."

Thus, a purchaser at Penney's is in the same position no matter what the specific contract provides: If he pays within thirty days, or within "one month after each monthly billing date," he pays no additional charge. If he does not, he pays an additional charge at the rate of one and one-half percent on the unpaid balance then due.

---

[5] (1963), 175 Neb. 775, 782, 783, 124 N. W. 2d 198.

[6] *See* 54 Op. Atty. Gen. (1965), 235, 248, 249.

In substance, there is no difference.[7] In cases of alleged usury, this court will look through the form of the agreement to the substance.[8]

Similarly with the distinction between bank charge cards and department store charge cards. It seems universally accepted that the bank can charge no more than one percent per month on the unpaid balance. Yet what is the practical distinction between the two? On oral argument respondent dismissed this question by stating the one (bank) was a loan of money to make a purchase, the other was an extending of credit on a credit purchase. This begs the question, the question of whether there is involved here a true credit sale or a charge for a forbearance. The assumption that the Agreement constitutes a true "credit sale" or "time-price sale" as it has come to be defined in the law, is incorrect.

Sec. 138.05 (1), Stats., also indicates it is the substance of the transaction, not the form, which controls since the statute contains such terms as *"directly or indirectly, contract for . . . ."* Clearly then, if there is in *substance* a forbearance, the form of forbearing will not prevent the application of the statute.

Respondent also contends that the term "forbearance" has a particular meaning in the law (restraining from collecting an existing debt) and therefore sec. 990.01 (1), Stats., requires that the court give the term that particular meaning in construing sec. 138.05 (1).

In the first place, it has already been shown that the Agreement contemplates a "refraining" from collecting "an existing debt."

---

[7] *See Universal Credit Co. Inc. v. Lowell* (1938), 166 Misc. 15, 22, 2 N. Y. Supp. 2d 743, 750, where a New York court held an automobile sale contract usurious, despite the fact that at no time was the cash price for the car due and payable. The court went on to note that the *terminology* used in the contract had no bearing on the issue. *See also: Raben v. Overseas Barters* (1967), 55 Misc. 2d 613, 286 N. Y. Supp. 2d 404.

[8] *Lee v. Peckham* (1863), 17 Wis. 394 (*383), 398 (*386).

Second, and more important, however, applying respondent's theory (discussed below) that when the Wisconsin legislature adopted the New York statute it also adopted the construction placed upon it by the New York courts,[9] with special emphasis by respondent on *Dry Dock Bank v. American Life Ins. & Trust Co.,*[10] it can be argued that the *Dry Dock* decision made it quite clear that the term "forbearance" can apply to sales of personal property.

In *Dry Dock* the court did state (as respondent notes):

"The terms 'interest' and 'forbearance' can not be predicated of any other than a loan of money, *actual or presumed.*" (Emphasis supplied.) [11]

But the court also stated:

". . . Upon the sale of property on time, the purchase money becomes a debt which is forborne for the period limited by the credit.

"Accordingly where usury is disguised under a sale of merchandise, the property in the goods passes to the vendee, but the excess of price over the just value, is considered as a premium *for the forbearance of the debt,* founded on a *presumed loan* of so much of the purchase money as is equivalent to the cash value of the commodity sold." (Emphasis added.) [12]

In effect, the court is stating it will look behind the form of the transaction to the substance, and if it is sub-

---

[9] This is a well-recognized principle of law. *Laycock v. Parker* (1899), 103 Wis. 161, 180, 79 N. W. 327.

[10] *Supra,* footnote 4, at page 358. *See also, infra,* for a more complete discussion of the case as to its holding related to the applicability of usury statutes to sales of property.

[11] *Id.* at page 355. Respondent also quotes another statement which might be confusing unless seen in context: "In a word, . . . sales of credit . . . are [not] touched by the statute." The court here is speaking of sales *of* credit *not* sales *on* credit, *i.e.,* specifically a sale of credit by selling the use of a letter of credit. *Id.* at page 358.

[12] *Id.* at page 358.

stantially usurious, the court will apply the language of the statute *substantially* as well. Subsequent New York cases have not altered the basic propositions set out in *Dry Dock.*

Even *Mandelino v. Fribourg* [13] does not dispute these propositions. That case dealt with a seven percent purchase money mortgage, which was held not to be usurious.[14]

Subsequent New York cases have explained *Dry Dock,* but not in respondent's favor. The New York Court of Appeals, in *London v. Toney,*[15] discussed the *Dry Dock* interpretation of the usury statute.

". . . In *Dry Dock* . . . the court discerned a covert loan of money disguised as an exchange of securities. The only question was whether the transaction constituted a loan of money. The discussion in the opinion extended over a wide range, the general effect of which is that the statutory use of the word 'loan' means, of course, a loan of money and not a loan of goods or credit." [16]

It further stated:

". . . No statute and no decision by this court have been called to our attention by which forbearance of money must, in order to constitute usury, be preceded by an actual loan. The contrary is true." [17]

Exactly. There need be no actual loan, only a forbearance of money under conditions where, in the words of *Dry Dock,* a loan will be presumed.

The view that the New York usury statute can apply to sales of property is considered also in *Universal Credit Co., Inc., v. Lowell,*[18] involving the sale of an automobile on a conditional sales contract and a time-price "differ-

---

[13] (1968), 23 N. Y. 2d 145, 242 N. E. 2d 823.

[14] *Id.,* 242 N. E. 2d at page 825.

[15] (1934), 263 N. Y. 439, 189 N. E. 485.

[16] *Id.,* 263 N. Y. at 444, 189 N. E. at page 487.

[17] *Id.,* 263 N. Y. at 447, 189 N. E. at page 488.

[18] *Supra,* footnote 7, at page 19.

ential" in excess of the rate allowed under the statute. The plaintiff argued that the usury statute did not apply to the sale of personal property on credit. The court then reviewed the various New York cases,[19] and concluded:

"Unquestionably the law has been for more than one hundred years, and now is, as announced by the Court of Appeals in the *London* case, that the usury statute is not confined to those instances arising from actual loans of money, but is equally applicable to the forbearance of a money debt, otherwise created. The original debt in the *London* case grew out of the sale of land. It was the forbearance of this debt which the court held usurious.

"If the forbearance of a debt created out of a sale of land may be usurious, just why may not the forbearance of a like debt growing out of the sale of personal property be usurious? Is there any difference in the principle involved? Both are based on the forbearance of money. In the latter proof may be more difficult. But since when did difficulty of proof condone a wrong? If taking more than the legal rate of interest for the forbearance is established, the penalty follows. And this, whether the debt arose out of the sale of a farm or an automobile." [20]

It is clear then that the interpretation of the New York usury statutes by the New York courts is not as respondent contends it is, and even if this court accepts respondent's implied theory that it is bound by New York court interpretations subsequent to the adoption of the New York usury statute by the Wisconsin legislature in 1851, as well as by such decisions prior thereto, there is no reason to hold that the Wisconsin usury statute does not apply to sales of real or personal property.

[19] *Id.*

[20] *Id.* at page 21. *See also, Hogg v. Ruffner* (1861), 66 U. S. 115, 118, 17 L. Ed. 38: "The original contract by which a debt is created may be for the purchase and sale of land, and it will be, nevertheless, contrary to the statute for the vendor to demand or receive more than legal interest for the forbearance of such debt . . . ."

*Are "credit" or "time-price" sales covered by usury statutes?*

Respondent strongly urges that the usury statute does not apply to the Penney Agreement because it is in form and substance a "credit" or "time-price" sale, and that such sales are, and historically have been, excluded from the coverage of usury statutes.

The trial court concluded:

". . . Nor does the case at bar come within the concept that one price for cash and a much higher price for a sale in which the purchase price will be paid in the future does not involve the issue of usury, as in Ruffner v. Hagg [sic], 66 U. S. 115."

In *Hogg v. Ruffner,*[21] the court declared what it considered to be the established rule:

"But it is manifest that if A propose to sell to B a tract of land for $10,000 in cash, or for $20,000 payable in ten annual instalments, and if B prefers to pay the larger sum to gain time, the contract cannot be called usurious. A vendor may prefer $100 in hand to double the sum in expectancy, and a purchaser may prefer the greater price with the longer credit . . . . Such a contract has none of the characteristics of usury; it is not for the loan of money, or forbearance of a debt." [22]

It is clear, as many authorities have noted, that the traditional "time-price" or "credit" sale has been consistently excluded from the coverage of the typical usury statutes,[23] and this "time-price doctrine" has been accepted by this court.[24] However, even in 1861 the court stated that there was a limitation upon this doctrine:

"The only limitation upon this principle, if it may be properly so called, is that made necessary for the purpose

[21] *Supra,* footnote 20.

[22] *Id.* at pages 118, 119.

[23] *See, e.g.,* 54 Op. Atty. Gen. (1965), 235, 235–239; Annot. (1967), 14 A. L. R. 3d 1065, 1077–1084.

[24] *Otto v. Durege* (1861), 14 Wis. 621 (*571).

of giving effect to the spirit and intent of the law against usury, by preventing the parties from resorting to the *form* of a sale as a cloak or cover for what is in reality a usurious loan. In such cases the law looks behind the shifts and devices of the parties, and, according to the fact, declares the transaction to be a *loan* and not a *sale.*" [25]

The court will always look behind the form of the transaction to determine if in substance it is a device to avoid the usury statute.

Respondent argues that there was a concerted attempt to include time-price sales within the ambit of the usury statute adopted in 1851. However, it was the true, traditional time-price sale that was contemplated at the time. The example of the time-price sale presented in *Hogg v. Ruffner* [26] ("if A propose to sell to B a tract of land for $10,000 in cash, or for $20,000 payable in ten annual instalments") is precisely the situation considered by the legislature in 1851, as indicated by respondent's quotation from the majority report:

" 'I have a horse worth $100, you have $100 in money —shall I be permitted to sell my horse for $125, and you be prohibited from loaning your money at 25 percent interest?' "

The rationale for the distinction between the two transactions is essentially that set forth in *Dry Dock.*[27] Respondent's conclusion, then, that "the majority and the legislature clearly intended that the statute would not apply to sales transactions" is an overstatement. The legislature intended the statute not to apply to the true "time-price" sale as it was conceived of by the courts at that time, and in no way did it consider it not to apply to any sales transaction, least of all a transaction of the type presented in this case. The modern credit card

[25] *Id.* at pages 623, 624 (*573, *574).

[26] *Supra,* footnote 20.

[27] *Supra,* footnote 4, at pages 357, 358.

transaction could hardly have been within the view of the legislature.

Further, it is this concept of the "time-price" sale which this court had in view when it decided *Otto v. Durege*,[28] in which case the court stated exactly what respondent notes:

". . . The penalties and prohibitions of the statute are aimed at the receiving or contracting to receive a greater rate of interest than that prescribed by it upon the *loan* or *forbearance* of money, or other things, and do not apply to the *sale* of a note or any other vendible commodity, which when in good faith intended as such, may be sold and transferred for such price as may be fixed by the agreement of the parties."[29]

Similarly, all other early cases which excluded time-price sales must be viewed in light of the existing concept of a time-price sale, and the particular questions presented to the court.

Respondent's argument that subsequent attempts by the legislature to include credit sales indicate that such are not included within the ambit of the statute, has little merit. It could be correctly argued on the other hand that had a statute been passed to specifically regulate revolving charge accounts, such measure would amount to nothing more than a codification of the existing common law, and that the failure to do so was just that, a failure to codify existing common law, not a failure to include a transaction that had been specifically excluded by the courts.

While the "time-price" doctrine has consistently been given effect by courts throughout the country, the willingness of the courts to look behind the form of the transaction to its substance has been manifested. There are various factors to which courts look to determine the substance of the transaction in question, and there are various indicia which courts point to in determining that

[28] *Supra*, footnote 24.
[29] *Id.* at page 623 (*573).

a particular transaction is not a true "time-price" sale.[30] These include insufficient disclosure of two prices (cash price and credit price) to both parties; close relations between seller and transferee of negotiable paper; ambiguous charges in the sale contract; seller's specific agreement to finance the purchase; credit price calculated in terms of interest or percentage; sales tax computed on cash price; etc.[31] These and other factors are also noted with respect to this particular case in the trial court's excellent opinion. We repeat the trial court's detailed analysis of factors here because it points out so well why it considered this revolving charge account to be a forbearance of money and not a time sale.

"The following facts gleaned from the contract and the stipulation of facts may lead to the inference that the charge of one and one-half percent per month is a mere addition to the purchase price in the nature of an increase in price for time sales:
"1. There is no loan as such. Everything promised is but a charge or consideration for the sale. *Uniserve Corp. v. Commissioner of Banks,* 207 NE 2d 906 (Mass.)."

However, the statement of the *Dry Dock* court that a loan will be presumed in certain situations, *supra,* is applicable.

"2. The contract by its terms permits the purchaser to pay cash and to lower the cost of the merchandise by payment even after the services charges have been begun. The election is that of the customer. See *Randall v. Home Loan & Improvement Co.,* 244 Wis. 623."

The customer has the option of lowering the price of the merchandise by payment even after the services have begun to run. However, in the classic example posed by

[30] *See,* 54 Op. Atty. Gen. (1965), 235, 243–245; Annot. (1967), 14 A. L. R. 3d 1065, 1128–1143.
[31] *Id.*

the United States Supreme Court in *Hogg v. Ruffner*,[32] the purchaser does not have this option. Hence it is arguable that this factor tends to show that the Penney Agreement is not a traditional "time-price" sale. This is true of factor 3 as well.

"3. There is a cash sales price quoted and by the contract a formula is stated for calculating the additions to the sales price, so that the purchaser may, by his own will, determine the length of time he will take to pay and the extra charges that he will be compelled to pay. The purchaser is informed and has an opportunity to choose between a cash price and a higher cost over a period of time. See *McNish v. Grand Island Finance Co.*, 83 NW 2d 13 (Neb.).

"The following facts would indicate that the 'service charge' is in fact interest, that is, a consideration for a forbearance:

"1. The contract was not entered into in connection with a sale, but in contemplation of a sale or sales in the future.

"2. The investigation and approval of the account indicates an intent by the defendant to extend credit on a basis of the purchaser's ability to pay.

"3. There is an absolute sale of goods, with transfer of title on delivery and the creation of a debt as a consideration for the sale. See *Bell v. Idaho Finance Co.*, 255 P 2d 715 (Utah)."

It appears impossible to distinguish this from the identical factors present in the bank charge card situation discussed earlier.

"4. There may be multiple sales with debits to the account of the customer and also credits for payments. The account is a running account, open for additional debits as sales are made, and open for credit of payments made. The account is in effect an open charge account for goods purchased. While it may consist of but one sale in many instances, it is open and in many cases used for additional charges for multiple sales at different

---

[32] *Supra*, footnote 20, and quotation from the case.

times, as well as credits for payments on account. See *Hannan v. Engelmann,* 49 Wis. 278; *Meyer v. Selover,* 225 Wis. 389."

There are many similarities between the Agreement and a typical open account. Respondent argues that an open account is distinguishable on the ground that the amount due is payable on demand. While the amount due here is not payable on demand per se, it is clear that the entire amount of all purchases or the total unpaid balance is payable under the Agreement upon default of the purchaser, *i.e.,* failure to make the required monthly minimum payment. Respondent's distinction seems slight in light of the following description of an open account:

"Properly speaking, the term 'open account' means only an account the balance on which has not been ascertained; an account based upon running or concurrent dealing between the parties which has not been closed, settled, or stated, and which is kept unclosed with the expectation of further transactions.

". . .

"An open account results where the parties intend that the individual items of the account shall not be considered independently, but as a connected series of transactions, and that the account shall be kept open and subject to a shifting balance as additional related entries of debits and credits are made, until it shall suit the convenience of either party to settle and close the account, and where, pursuant to the original express or implied intention, there is but one single and indivisible liability arising from such series of related and reciprocal debits and credits. This single liability is to be fixed on the one part or the other, as the balance shall indicate at the time of settlement, or following the last pertinent entry . . . ." [33]

If the Penney Agreement does not fall precisely within this definition, it is clear that it has a considerable number of the characteristics detailed. Even the method of

---

[33] 1 Am. Jur. 2d, *Accounts and Accounting,* pp. 373, 374, sec. 4.

applying the payments, *i.e.*, to the earlier purchases first, is consistent with the application of payments made by courts when there is no method agreed to by the parties.[34]

"5. The 'service charge' is not a fixed amount, independent of the amount owed, as in *Hafner v. Spaeth,* 156 P 2d 408 (Wash.). Rather it is a percentage of a balance of indebtedness and is computed monthly. As was said in *Lloyd v. Gutgsell,* 124 NW 2d 198, 126 NW 2d 224 (Neb.), '. . . the charge is for the forbearance to collect the cash price or for the use of money.' "

*Lloyd v. Gutgsell* [35] further states:

"There seems to be an impression that if a cash price is quoted and the buyer is unable to pay cash, it is then possible to apply a certain schedule of rates or charges to the cash price in order to determine the time sale price, the difference being denominated a time price differential. It is possible to do so if the resulting charge does not exceed 9 percent simple interest. If it does, we have a usurious transaction. Where a time sale price is determined by applying a certain schedule of rates or charges to the cash price, the resulting product is interest. This is merely a sale for a cash price, with the difference between the money the buyer has and what he needs being financed." [36]

This description is accurate for the method employed in the Penney Agreement.

"6. It has been held that the absence of a quotation to the customer of a time sale price as well as a cash price, with a computation of the cost of credit by a formula is an indicia that it is not a bona fide time sale price, and the addition to the cash price is an extension of credit in the nature of a loan. *Daniel v. First National Bank,* 227 F 2d 353; *State v. Associates Discount Corp.* 77 NW 2d 215 (Neb.) ; *Mossler Acceptance Co. v. McNeal,* 252 SW 2d 593 (Tex. Civ. App.).

"7. There is no evidence that the cost of the service necessary, or expense incident to the operation of the

[34] *Hannan v. Engelmann* (1880), 49 Wis. 278, 283, 5 N. W. 791.
[35] *Supra,* footnote 5.
[36] *Id.* at page 782.

account, such as bookkeeping, billing, etc., bears any relation to the 'service charge.' It would seem that it does not cost any more monthly to service a $500 balance in an account than it does a $50 balance, and yet the 'service charge' is based on the balance, not the cost. Cf. *Friedman v. Wis. Acc. Corp.*, 192 Wis. 58.

"8. The contract in the case at bar is made prior to any sale and is not part of the sale, except as it becomes a part by reference if the customer elects not to make a cash payment of the purchase price before the service charge is imposed. The only price at which the goods are offered at the time of sale is the cash price and the actual total time sale price is neither calculated or quoted at the time of sale. The difference is well illustrated by the difference in the transactions in *McNish v. Grand Island Finance Co.*, 83 NW 2d 13 (Neb.)."

The Nebraska Supreme Court, consistent with the general view of those courts who hold that a valid time-price agreement depends on the presentation of two prices to the purchaser,[37] has stated:

"An essential of a valid time sale price is a price agreed upon between the parties where the buyer is actually informed of and *has at the time the sale is made an opportunity to choose between a cash and a time sale price.*" (Emphasis added.) [38]

And the Arkansas court has stated that even the time-sale price itself may be a device to avoid the usury statute.[39]

"9. The contract does not differ in form from one customer to the next nor does it differ in substance. It is a standardized form applicable to all customers with the same 'service charge' to all, based upon the amount of the debt and it requires a monthly calculation. The contract does not contemplate a single sale only. We have

[37] *See also, supra*, footnote 22.

[38] *Wood v. Commonwealth Trailer Sales, Inc.* (1961), 172 Neb. 494, 499, 110 N. W. 2d 87.

[39] *Hare v. General Contract Purchase Corp.* (1952), 220 Ark. 601, 249 S. W. 2d 973.

found no cases which have held that a contract covering more than a single sale is a true time credit sale."

Nor have we. Indeed even all of respondent's examples in attempting to show the difference between a "time-price" sale and a sale for cash use the example of one purchase.

"10. The 'service charge' is not a penalty for failure to pay on time installments as they come due. It is not exacted to compel prompt payment when due as in *Randall v. Home Loan & Improvement Co.*, 244 Wis. 623. Rather it is a charge for the privilege of not paying the cash price promptly, and the failure to pay the cash price before the 'service charge' is imposed has the blessing of and is encouraged by the defendant.

"11. The sales tax is computed on the cash price." [40]

Respondent notes that the tax "is computed on the cash price pursuant to sec. 77.54 (8), Stats." This statute, however, provides:

"77.54 **General exemptions.** There are exempted from the taxes imposed by this subchapter:

"...

"(8) Charges for interest, financing or insurance where such charges are separately set forth upon the invoice given by the seller to the purchaser."

In the traditional time-price sale, however, there are only two prices: The cash price and the time price. The extra amount for credit is not separately stated, although it can be easily arrived at by simple subtraction (which is not true with the Penney Agreement).

Further, the statement of the Nebraska Supreme Court seems appropriate:

"... Where a time sale price is determined by applying a certain schedule of rates or charges to the cash price, the resulting product is interest." [41]

---

[40] *See, e.g., Associates Investment Co. v. Sosa* (Tex. Civ. App. 1951), 241 S. W. 2d 703.

[41] *Lloyd v. Gutgsell, supra,* footnote 5, at page 782.

If this is true, then the Penney Agreement complies with the statute's mandate in terms of "charges for interest." However, if the rate of interest is computed by applying a percentage of one and one-half percent to the unpaid monthly balance, it is difficult to see how the seller could ever compute the tax on a total of the cash price plus the time price differential.

An interesting question is whether the phrase "invoice given by the seller to the purchaser" means the sales slip (where there obviously is no separate statement of a time price differential because it is not computable at the time of purchase since (1) the purchaser may avoid any service charge by paying within thirty days of the billing date; and (2) the service charge is determined on the basis of the total purchases, *i.e.,* the unpaid monthly balance), or the monthly statement.

In any event, compliance with the statute at most indicates that there is in reality only one price, the cash price, and that there is no time-sale price as such. It certainly does not restrict the import above of this factor in determining whether a purchase under the Penney Agreement is in fact a time-price sale.

### Is there intent to avoid the usury statute?

"If the contract on its face imports usury, the necessary intent will be implied, but if usury is not apparent from the contract itself, the intent must be gathered from the circumstances of the case. . . . The intent of the parties to an alleged usurious agreement, when not clearly apparent from the face of the agreement, is a question of fact for the jury to determine, considering the whole evidence, but it may be declared as a matter of law if only one conclusion can be reached from the evidence." [42]

In the instant case the trial court was the trier of fact and determined that the intent to exact a usurious rate

---

[42] 45 Am. Jur., 2d, *Interest & Usury*, p. 130, sec. 160.

was disclosed on the face of the Agreement involved. This finding does not appear to be unreasonable in light of all the facts, and the reasonable inferences drawn therefrom by the trial court. While this court is not bound by findings of fact in a case where they are undisputed by stipulation,[43] the trial court's conclusions are reasonable. Many of the factors noted by the trial court as indicia that purchases under the Agreement are not in fact time-price sales have frequently been held to be indicia of an attempt to evade the usury laws.[44] For example, once the courts find that the particular transactional agreement is not a true time-price sale, the sale is declared usurious.[45]

A statement by the Arkansas Supreme Court in *Sloan v. Sears, Roebuck & Co.* is in point:

"Unfortunately, in the case at bar the seller happens to be a company bearing a splendid reputation for its dealings with the public; the amount of interest charged in excess of 10 percent per annum, permitted by the constitution, is not great, but if we should hold that this contract is not usurious, it would be a precedent by which all the sellers of merchandise of every kind and description could add any amount to the cash price as interest, carrying charge, differential or what not, that those whom the constitution and statutes were designed to protect would of necessity agree to pay. And art. 19, sec. 13, of the constitution, prohibiting usury, would amount to nothing more than a scrap of paper." [46]

II. *Should an injunction issue against respondent?*

The state contends:

"It is well settled that an open, continuous and intentional violation of a public statute constitutes an enjoinable public nuisance under sec. 280.02, Stats."

---

[43] *National Amusement Co. v. Department of Revenue* (1969), 41 Wis. 2d 261, 266, 163 N. W. 2d 625.

[44] *See* Annot. (1967), 14 A. L. R. 3d 1065, 1128–1143.

[45] *See, e.g., Lloyd v. Gutgsell, supra,* footnote 5; *Sloan v. Sears, Roebuck & Co.* (1957), 228 Ark. 464, 308 S. W. 2d 802.

[46] *Sloan v. Sears, Roebuck & Co., supra,* footnote 45, at page 473.

The respondent states:

"If, in the opinion of this court, respondent is violating a Wisconsin statute by its plan, it obviously would desist whether or not an injunction issues.

"Because the court may be interested in respondent's view as to the merits of the appellant's position on the injunction point, we state that it concurs in the appellant's interpretation of the cases cited by it in the first paragraph on page 37 of its brief."

Hence there is no dispute between the parties on this issue.

The trial court stated, however, in its conclusions of law:

"2. That the right to assert the violation of section 138.05 (1) (a) is a right personal to the persons who contract with defendant under said plan and is not a matter in which the state of Wisconsin has any right or interest nor does it create any common or public nuisance requiring defendant to be enjoined at the instance of the state."

The United States Supreme Court, in *In re Debs*,[47] in discussing the right of the federal government to bring suit to enforce an injunction, stated:

". . . Every government, entrusted, by the very terms of its being, with powers and duties to be exercised and discharged for the general welfare, has a right to apply to its own courts for any proper assistance in the exercise of the one and the discharge of the other, and it is no sufficient answer to its appeal to one of those courts that it has no pecuniary interest in the matter."

Further, many states have held that an injunction is proper in cases involving usury. While many have emphasized the presence of oppressive tactics on necessitous borrowers, only one case *requires* such factors.[48] Other cases have emphasized the presence of these factors and more as makeweights than as necessary requirements.

[47] (1895), 158 U. S. 564, 584, 15 Sup. Ct. 900, 39 L. Ed. 1092.
[48] *Nash v. State* (1960), 271 Ala. 173, 123 So. 2d 24, 83 A. L. R. 2d 842.

In *State, ex rel., v. Basham,*[49] the Kansas Supreme Court enjoined a usurious operation in which there was little more than veiled threats of pressure tactics to collect, and no criminal penalty available to the state. In addition, most of the borrowers knew they were paying illegal interest. The court noted:

> "It is fundamental that courts are open to the state for an action either in its sovereign capacity or as a corporate entity. . . . The sovereignty of a state embraces the power to execute its law." [50]

While it is true that usury laws provide specific remedies for the borrower, it seems beyond question that they are enacted for the benefit of the public generally. If so, the state certainly has an interest in seeing that the law is not continually violated.

The trial court placed great stress on the fact that in all the cases in which an injunction was granted by a Wisconsin trial court and approved by this court for the continued violation of a statute, the statute violated carried a criminal penalty. However, this distinction is unwarranted. In *State ex rel. Cowie v. La Crosse Theaters Co.,*[51] which did involve a criminal statute prohibiting lotteries, it was contended that although violations of criminal statutes might be enjoined by the courts, these violations could not be enjoined as nuisances unless specifically declared to be nuisances by statute. The court, in rejecting this argument, stated:

> ". . . The proposition as to the power of equity to abate public nuisances is stated in 5 Pomeroy, Eq. Jur. (2d ed.) sec. 1893, where it is said:
> " 'Wherever a public nuisance is shown, equity must enjoin it at the suit of the government. "Every place where a public statute is openly, publicly, repeatedly, continuously, persistently, and intentionally violated, is a public nuisance." '

---

[49] (1937), 146 Kan. 181, 70 Pac. 2d 24.
[50] *Id.* at page 185.
[51] (1939), 232 Wis. 153, 286 N. W. 707.

"This definition is taken from *State ex rel. Vance v. Crawford*, 28 Kan. 726, where there is coupled with the language above quoted after the word 'violated,' 'in defiance of the constitution and laws of the state.' . . ." [52]

A more reasonable view of the availability of injunctive relief than that of the trial court was expressed by the Kansas Supreme Court in *State, ex rel., v. Basham*.[53] There the defendant, in effect, conceded he was charging interest in excess of the amount allowed by the usury statute, but argued the court could not enjoin his activities (1) because there were no criminal penalties provided; and (2) because his "tactics" were not sufficiently oppressive to constitute a public nuisance. In answer to the second, the court pointed out that there could be no valid distinction made between violators of the statute on the basis of their collection methods. In answer to the objection that since there were no criminal penalties provided, an injunction should not issue, the court observed:

". . . This point was considered in *State, ex rel., v. McMahon* . . . and held not to be a bar to an action for injunction by the state. Indeed, the fact a criminal action cannot be maintained makes injunction all the more appropriate, since the state does not have that remedy for the enforcement of the statute." [54]

Also, the Minnesota Supreme Court, in *State ex rel. Goff v. O'Neil*,[55] in enjoining alleged usurious loans to rather necessitous wage earners, noted that, in its view, where no adequate remedy existed at law, equity would relieve by injunction. In noting the necessity for equitable action in that case, the court stated that both the necessitous condition of the borrowers and the small amounts in controversy were factors:

[52] *Id.* at page 161.
[53] *Supra*, footnote 49.
[54] *Id.* at pages 183, 184.
[55] (1939), 205 Minn. 366, 286 N. W. 316.

"... It appears ... that the remedy available to defendant's victims is ineffective to stop the practice. They have not the means to employ a lawyer. The amounts involved are so small that to seek to recover what has been illegally extorted or defend against the obligation given for the loan would cost more than the amounts involved, besides the loss of time and the annoyance of litigation." [56]

In *Bartell Broadcasters v. Milwaukee Broadcasting Co.*,[57] this court stated:

"... However, injunctions are not to be issued lightly but only to restrain an act that is clearly contrary to equity and good conscience. Whether or not an injunction should be granted depends upon the facts and circumstances in each case." [58]

We take judicial notice of the widespread use of the revolving charge account and of the large number of Wisconsin citizens affected by these practices. We have no hesitancy in endorsing an injunction against the usurious practices which clearly constitute a public nuisance here and should be discontinued.

As the Kansas Supreme Court noted:

"There is no reason defendant should be permitted openly, notoriously, and flagrantly to violate our valid laws enacted for benefit of our people. The state would be weak indeed if it were powerless to prevent it. Criminal prosecution is not available. Injunction is the only remedy." [59]

Since an injunction should issue with reference to the transaction which we hold to be usurious under sec. 138.05 (1), Stats., it is unnecessary for us to consider the applicability of sec. 138.09 (9) (a) or the several provisions of ch. 214.

*By the Court.*—Order reversed and cause remanded with directions to issue an injunction.

---

[56] *Id.* at pages 373, 374.

[57] (1961), 13 Wis. 2d 165, 108 N. W. 2d 129.

[58] *Id.* at page 171.

[59] *State, ex rel., v. Basham, supra,* footnote 49, at page 186.