JEFFREY B. BARTELL Commissioner of Securities
You have requested my opinion as to whether sec. 138.05 (1) (a), Stats., operates to limit the interest rate which may lawfully be charged by a securities broker-dealer in connection with margin account agreements with its noncorporate Wisconsin customers. You state that under the federal securities laws, securities broker-dealers are in effect permitted to loan money to their customers pursuant to margin account agreements for the purpose of financing purchases of certain registered securities which are referred to as purchases "on margin." You further state that the Board of Governors of the Federal Reserve System promulgates rules with respect to the amount of credit that may be initially extended (and subsequently maintained) by a broker-dealer on any registered security.
You further give the following example of the type of transaction to which you refer: that if the margin level prescribed by the Board of Governors is 50 percent, a customer purchasing for $100 a qualified security in a margin account must put up $50 in cash (or securities which at 50 percent of their current market value equal $50) to make the purchase. The balance of $50 needed to pay the seller of the security is then "loaned" to the customer by the broker-dealer who makes use of its existing credit sources to obtain the money.
You further state that the rate of interest charged customers by broker-dealers under margin account agreements varies from firm to firm, but is generally set at approximately 1 percent above the rate which the broker-dealer is charged by its lenders.
A second, related question on which you solicit my opinion is whether the presence of a clause in such a margin account agreement stating that the agreement and its enforcement should be governed by the laws of some state other than Wisconsin affects my determination of the first question
As set forth more fully below it is my opinion with respect to your first question that sec. 138.05 11) (a), Stats., does operate to limit the interest rate which may be lawfully charged by a *Page 13 
securities broker in connection with margin account agreements with its noncorporate Wisconsin customers. With respect to your second question, it is my opinion that a choice-of-law provision in a margin account agreement will have the effect of avoiding the applicability of sec. 138.05 (1) (a) to interest charges made under the agreement if and only if the agreement bears "a reasonable relation," as that phrase is used in sec. 401.105
(1), Stats., to the state of the chosen law.
 1. Applicability of Sec. 138.05 (1) (a) to margin account agreements.
Section 138.05 (1) (a) of the Wisconsin Statutes reads as follows:
 "(1) Except as authorized by other statutes, no person shall, directly or indirectly, contract for, take or receive in money, goods or things in action, or in any other way, any greater sum or any greater value, for the loan or forbearance of money, goods or things in action, than:
 "(a) At the rate of $12 upon $100 for one year computed upon the declining principal balance of the loan or forbearance;"
Since I find no other provisions of the Wisconsin Statutes which authorize securities broker-dealers to charge interest on margin accounts at a rate in excess of that permitted by this provision, your first question must be answered simply by a determination of whether the transactions which you describe are covered by the particular language of sec. 138.05 (1) (a). The conduct proscribed by this provision is, of course, commonly known as usury, the elements of which were set forth by the Wisconsin Supreme Court in State v. J. C. Penney Co. (1970),48 Wis.2d 125 at 132, 179 N.W.2d 641, quoting Zang v. Schumann
(1952), 262 Wis. 570 at 579, SS N.W.2d 864, and 55 Am. Jur.,Usury, page 331, sec. 12:
 "The definition of usury imports the existence of certain essential elements generally enumerated as (1) a loan or forbearance, either express or implied, of money, or of something circulating as such; (2) an understanding between the parties that the principal shall be repayable absolutely; *Page 14 
(3) the exaction of a greater profit than is allowed by law; and (4) an intention to violate the law . . . ."
With respect to the first and second elements stated above, their presence would seem to be implicit in your example. When the broker-dealer purchases securities for his customer, the customer presumably becomes indebted to the broker-dealer for such amount as the broker-dealer has borrowed for the purpose of making the purchase, and the resulting debt is presumably carried by the broker-dealer so long as the customer pays the interest and meets the other requirements of the margin account agreement. This constitutes a forbearance of the money owed the broker-dealer by the customer. See State v. J. C. Penney Co., supra, at 133 et seq. Since, in your example, it does not appear that the customer's obligation to satisfy such a debt is conditioned in any respect, it is "repayable absolutely."
The third element of usury — the exaction of a greater profit than allowed by law — is, I believe, also present under the agreements you describe, if the rate of interest charged by the broker-dealer exceeds the 12 percent per annum rate established by sec. 138.05 (1) (a). It may be true, of course, that much, if not all, of this "profit" simply offsets the cost of the borrowed money to the broker-dealer. However, the same is true to some extent with respect to any lender who "buys" money to lend to others, and I can find no basis in the language of sec. 138.05 (1) (a) or in the case law for taking such costs into account in determining how much "profit" was exacted.
It might be argued by a broker-dealer that at least the additional 1 percent which he charges to the customer for the money he has borrowed should not be considered "profit" if such amount merely serves to cover administrative expenses incurred by him in obtaining the loan. While there is case law for the proposition that certain specific expenses incurred by a lender in connection with making a loan may be charged to the borrower in addition to interest at the highest lawful rate (see 91 C.J.S., Usury, sec. 48), the Wisconsin Supreme Court has recognized that such additional charges are frequently the means by which the usury laws are violated. The Court, in State ex rel.Ornstine v. Cary (1905), 126 Wis. 135, at 140, 105 N.W. 792, stated: *Page 15 
 "Contracts made in connection with the transaction of loaning money, under a scheme whereby the lender or his authorized agent receives payments of money or its equivalent in excess of the legal rate of interest, have been held to be prohibited by the law and not enforceable as valid obligations. [Citing cases.] The most common devices to accomplish such purposes were by means of charges against the borrower in the form of commissions, fees for appraisals, views, examinations, and renewals in connection with the loan . . . ."
And in Friedman v. Wisconsin Acceptance Corp. (1927), 192 Wis. 58
at p. 60, 210 N.W. 831, the Court has said that:
 ". . . in determining whether or not the transaction is usurious the court `will disregard its form and look to the substance, and will condemn it if all of the requisites of usury are found to be present, despite any disguise it may wear.' [Citing cases.]"
With respect to the example you have given, because the amount of the additional charge to the customer appears to be determined not by reference to specific expenses but rather on the basis of the amount loaned, it is my opinion that the additional charge must be considered as a part of the profit exacted by the broker-dealer.
If the third element of usury is present in the transactions you describe, it is likely that the fourth element — that of intent — will also be present. This element may be found from the face of the contract or from all of the facts and circumstances surrounding the transaction. State v. J. C. PenneyCo., supra, at 150-151. If the transaction in question results in the lender's exacting a profit in excess of the maximum lawful limit and it was the intent of the parties that the lender receive such profit, then, in my opinion, the fourth element would also be present.
In summary if in the transactions you describe the broker-dealer charges the customer "interest" in excess of 12 percent, it is likely that all of the elements of usury would be present. Section 138.05 (1) (a) does, therefore, operate to limit such charges by broker-dealers.
2. The Choice-of-Law Question. *Page 16 
Your second question is whether a clause in a margin account agreement between a broker-dealer and customer providing that the law of a state other than the State of Wisconsin shall govern the agreement would affect my answer to your first question.
The Wisconsin Supreme Court recognized at an early date that whether a particular contract or transaction is usurious depends upon which state's laws govern the contract or transaction in question. See e.g. Fisher v. Otis (1850) 3 Pin. 78, 3 Chand. 83;Newman v. Kershaw (1860), 10 Wis. 275. With respect to transactions subject to the Uniform Commercial Code (hereinafter the "UCC"), the extent to which parties may effectively choose which state's laws shall apply is now governed by sec. 401.105
(1), Stats. That section provides in pertinent part that:
 ". . . when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties . . . ."
Since the transactions you describe appear to be subject to the UCC (see ch. 408, Stats.), sec. 401.105 (1) has applicability here. A choice-of-law provision in a margin account agreement will, therefore, have the effect of avoiding the applicability of sec. .05 (1) (a) if the agreement and transactions thereunder bear "a reasonable relation" to the state of the chosen law. Whether such a relation is present depends upon whether a "significant enough portion of the making or performance of the contract is to occur or occurs" in the state of the chosen law. See Official UCC Comment to sec. 401.105.
Though our supreme court has not had occasion to apply the "reasonable relation" test of sec. 401.105 to an agreement such as you describe, courts in other states have applied the test to such situations. In Mell v. Goodbody Co., (App.Ct. Ill., 1st Dist. 3d Div., 1973) 10 Ill. App. 3d 809, 295 N.E.2d 97, a securities broker was sued by two customers for having charged excessive interest under Illinois law in connection with margin account agreements. The agreements provided that they would be governed by the laws of New York, under which the interest charged by the broker was legally permissible. The court, in applying the "reasonable relation" text contained in the Illinois UCC equivalent to sec. 401.105, noted that New York was the defendant's primary *Page 17 
place of business; that the major portion of the securities under the contracts were purchased and sold there; that the plaintiffs' collateral and the defendant's central records of all its margin accounts were kept there; that bills on margin accounts were made there; and that the defendant made its principal borrowings to cover its margin accounts there. The court also noted that the agreements in question had substantial relationships with Illinois (the opinion discloses that the defendant had three branch offices in the state) but held that the above factors established a sufficient "reasonable relation" with New York to justify giving effect to that state's laws as provided in the agreements. Similar decisions on similar sets of facts are found in McGrath v. Paine, Webber, Jackson Curtis, Inc. (Sup.Ct., D.C., 1974) CA 6807-73; Olerich v. CBWL-Hayden, Stone, Inc. (Dist Ct., Iowa, Sac Cty., 1974) Equity No. 14553; and Apel v. ReynoldsSecurities, Inc. (Dist.Ct., Minn., Hennepin Cty., 1973,) File No. 688046.
Though the above cases are not, of course, controlling as to what constitutes a "reasonable relation" under Wisconsin law, it is my opinion that if the facts surrounding an agreement of the type you describe are similar to those set forth above, the agreement will bear a "reasonable relation" to the state of the chosen law under sec. 401.105, Wis. Stats., and the choice-of-law provision therein will therefore have the effect of avoiding the applicability of sec. 138.05 (1) (a), Stats. If, however. the facts are such that an agreement does not bear a "reasonable relation" to the state of the chosen law, then sec. 138.05 (1) (a)., Stats., will apply regardless of the choice-of-law provision.
BCL:WDB *Page 18