Richard J. HAMMEL, Plaintiff-Respondent,†

v.

ZIEGLER FINANCING CORPORATION, a domestic corporation,
Defendant-Appellant.

Court of Appeals

*No. 82–1216. Submitted on briefs February 24, 1983.—
Decided April 22, 1983.*
(Also reported in 334 N.W.2d 913.)

† Petition to review denied.

For the defendant-appellant the cause was submitted on the brief of *Stephen O'Meara* of *O'Meara, Eckert & Pouros* of West Bend. *William D. Gehl* of counsel.

For the plaintiff-respondent the cause was submitted on the brief of *Denny, Yanisch & Binder* of Milwaukee, *William A. Denny* and *Terry J. Booth,* of counsel.

Before Scott, C.J., Voss, P.J., and Brown, J.

BROWN, J. Ziegler Financing Corporation appeals from a summary judgment granted to Richard Hammel. The trial court ruled that Ziegler had charged usurious interest rates to Hammel from March 1980 to March 1981; the rate charged on a mortgage note executed by Hammel to Ziegler sometimes exceeded twelve percent during this period. Ziegler contends that the trial court erred in concluding that Wisconsin usury law, and not Missouri statutes, controlled the contractual relationship of the parties. The choice of law is relevant because Missouri law clearly permits rates greater than twelve percent.[1] We conclude that Ziegler is correct and reverse.

On February 28, 1975, Ziegler sold Hammel a mobile home park located in Pettis County, Missouri. The parties, both residents of this state, executed a purchase money note for $430,000 and a Missouri deed of trust

---

[1] Section 408.035 (2) of the Missouri statutes permits parties to agree to *any* rate of interest in connection with business loans of $5,000 or more.

pledging the park as security. Each was effectuated in Wisconsin. The original note was due August 31, 1976. Hammel was unable to secure substitute financing as this date approached, and Ziegler agreed to extend the maturity date to February 28, 1977. When this next due date approached, Hammel requested that payment again be delayed, and Ziegler consented. In like manner, Ziegler subsequently granted several additional extensions, though the interest rate was sometimes altered. In March of 1980, the parties entered into what became the final modification agreement. The agreement made the outstanding sum payable on demand and tied the interest rate to the prime rate charged by a major Chicago bank. During the remainder of 1980 and until full payment in March 1981, Hammel was sometimes charged interest in excess of twelve percent under the terms of this final arrangement.

After paying the amount outstanding, Hammel sued Ziegler, seeking the return of interest paid during the months when the rate exceeded twelve percent. He alleged that under sec. 138.05 (1) (a), Stats.,[2] the amounts collected during these months were usurious. The trial court agreed and granted summary judgment to Hammel.

Ziegler claims the trial court erred in ruling that the Wisconsin statute was applicable to the transaction. It contends that the parties selected Missouri law to control their contractual relationship when they included the following provision in the promissory note:

[2] Section 138.05(1) (a), Stats., provides:

138.05 Maximum rate; prepayment, disclosure; corporations. (1) Except as authorized by other statutes, no person shall, directly or indirectly, contract for, take or receive in money, goods or things in action, or in any other way, any greater sum or any greater value, for the loan or forbearance of money, goods or things in action, than:

(a) At the rate of $12 upon $100 for one year computed upon the declining principal balance of the loan or forbearance;

This Note is secured by a First Deed of Trust of even date herewith on property located in Pettis County, Missouri, and this Note and all documents given to secure its payment are to be *construed* according to the laws of the State of Missouri. [Emphasis added.]

Although it is not disputed that the parties to a contract may specify the state law which is to control, *see First Wisconsin National Bank of Madison v. Nicolaou,* 85 Wis. 2d 393, 397–98 n. 1, 270 N.W.2d 582, 584–85 (Ct. App. 1978), *appeal dismissed,* 87 Wis. 2d 360, 274 N.W.2d 704 (1979), the trial court ruled that Hammel and Ziegler had not satisfactorily indicated a choice of Missouri law. Apparently, the trial court believed the use of the word "construed" evidences only an intention that Missouri law control mere contract construction. The court stated that had the parties wanted the Missouri statutes to regulate legal aspects of the transaction, including interest rate limits set by law, they could have said the documents were to be *governed* by the law of that state. We disagree with the trial court's analysis.

The purpose of contractual construction is to ascertain the true intention of the parties as expressed by the contractual language, rather than to put a trick interpretation or twist on one word. *Langer v. Stegerwald Lumber Co.,* 259 Wis. 189, 192, 47 N.W.2d 734, 735 (1951). A reasonable meaning should be given to all provisions of an agreement so as not to render any part of the contract surplusage. *Hastreiter v. Karau Buildings, Inc.,* 57 Wis. 2d 746, 748, 205 N.W.2d 162, 163 (1973). We recognize that some courts have attached significance to the distinction drawn by the trial court. *See, e.g., Boat Town U.S.A., Inc. v. Mercury Marine Division of Brunswick Corp.,* 364 So. 2d 15, 17 (Fla. App. 1978). We conclude, however, that the better reasoned cases are in accord with *C.A. May Marine Supply Co. v. Brunswick Corp.,* 557 F.2d 1163 (5th Cir. 1977) (adopting district court opinion).

In *C.A. May*, the issue was whether the Wisconsin Fair Dealership Law applied to a contract made by a Georgia dealer and a Wisconsin manufacturer. The "interpretation" section of the dealership contract stated:

This agreement and all of its provisions are to be interpreted and construed according to the laws of the State of Wisconsin.

Like this case, it was argued in *C.A. May* that the law of the state named in the contract did not control the rights and duties of the parties because the contract used the terms "interpreted or construed" instead of "governed." Although it recognized that the terms are technically distinguishable, the court concluded it was unlikely such a fine distinction was intended by the parties. *C.A. May*, 557 F.2d at 1165. The court said that it could "conceive of few circumstances where resort must be had to state law to determine the meaning of ambiguous terms, but not to impose state substantive law upon the parties." *Id.* The court also determined the definition of the word "construe" as meaning that the law of the state named in the contract controlled the entire relationship. *Id.*

*C.A. May* is persuasive reasoning. It is highly unlikely that the parties to this contract intended to make the distinction drawn by Hammel and the trial court. Common sense tells us that the process of construing an agreement includes, in addition to the definition of possible ambiguous terms, the application of the terms to the case in question. This application may require resort to extrinsic sources such as the substantive law. Thus, by indicating the law to be used in construing a contract, the parties effectively involve the substantive law of that state. Construction of a contract is, after all:

The process, or the art, of determining the sense, real meaning, or proper explanation of obscure or ambigous terms or provisions in a statute, written instrument, or

oral agreement, *or the application of such subject to the case in question, by reasoning in the light derived from extraneous connected circumstances or laws or writings bearing upon the same or a connected matter,* or by seeking and applying the probable aim and purpose of the provision. Drawing conclusions respecting subjects that lie beyond the direct expression of the term.

The process of bringing together and correlating a number of independent entities, so as to form a definite entity. [Emphasis added.]

Black's Law Dictionary 283 (5th ed. 1979).

■

We, like the court in *C.A. May,* can conceive of few instances where it would be reasonable to look to the law of a specific state to define contractual terms but to the law of a second jurisdiction to ascertain the legal effect of the agreement. Such a maneuver would be unreasonable because the meaning associated with a term by one jurisdiction might not mesh with the statutory and common-law scheme of another. The meaning given a word or phrase by the lawmakers of a particular jurisdiction is necessarily bound to the statutory and common law of *that* state. Because it is our function to ascertain the true intention of the parties by giving a reasonable meaning to all provisions of the agreement, we conclude that the Missouri usury law is applicable. Therefore, the amount collected for interest was not unlawful.

Even if Wisconsin law were applicable, and we have ruled it is not, the interest rate charged would still not be usurious. In our view, the extension granted Hammel in March 1980 falls within the parameters of sec. 138.05 (7), Stats. This subsection provides that the interest rate limits of sec. 138.05(1) do not apply to certain "forbearances" by the creditor:

(7) This section does not apply to any loan or *forbearance* in the amount of $150,000 or more made after May 26, 1978 unless secured by an encumbrance on a

one- to four-family dwelling which the borrower uses as his or her principal place of residence. [Emphasis added.][3]

[3] The trial court acknowledged sec. 138.05(7), Stats., but refused to rely on it. Citing *Wisconsin Trust Co. v. Cousins,* 172 Wis. 486, 503, 179 N.W. 801, 807 (1920), for the proposition that the extension of time in which to pay a pre-existing debt is not a discharge of the original obligation, but a carrying on of the prior agreement, the court said the modification agreement related back to the date of the original promissory note. It, therefore, concluded that the law in effect in 1975 was applicable.

A reading of the cases cited in *Cousins* reveals that the foremost reason, among others, for the creation of the relation-back rule was to protect creditors who issued renewal notes or granted extensions of the due date from arguments by individuals obligated on the original note that the renewal or extension extinguished their liability; thus, the rule has equitable origins. For example, in *The First National Bank of Milwaukee v. Finck,* 100 Wis. 446, 76 N.W. 608 (1898), two partners executed a note to the bank for $17,000. The partners pledged stock owned by them as collateral. The partnership was subsequently dissolved. One of the partners, Meyer, in consideration of the conveyance of property, made an agreement with the second partner, Finck, that he would pay Finck's share of the note. Meyer subsequently borrowed an additional $24,000. When both debts came due, Meyer executed a renewal note to the bank for $41,000. Meyer defaulted, and the bank obtained a judgment. The bank then wanted to sell the stock it held on the original note and apply the proceeds to the $41,000 judgment. Finck objected. One issue on appeal was whether the renewal note extinguished Finck's liability. The court, finding no express agreement that the renewal note was to be a payment of the original note, held that Finck remained liable on the original $17,000 debt.

The instant fact situation is unlike *Finck* and the other cases cited in Cousins. Here, we do not have a debtor seeking to avoid liability on the original note. The only dispute is whether a certain interest rate was properly charged after the creditor granted an extension of the due date. Thus, the primary reason for invocation of the relation-back rule—to insure that all original debtors remain liable to the creditor when an extension is granted—is not applicable here. Further, we see no reason why the rule should apply to the present set of circumstances. Therefore, we conclude that the

The principal amount owed by Hammel always exceeded $150,000. By refraining from insisting on payment of the note when due, forbearance occurred here. The definition of forbearance means "nothing more, as between a debtor and a creditor, than an agreement by the creditor not to attempt collection of a debt for an agreed length of time." *State v. J.C. Penney Co.*, 48 Wis. 2d 125, 134, 179 N.W.2d 641, 645 (1970). Hammel points to this very definition in *J.C. Penney* as his basis for arguing that forbearance did not take place in this instance. He posits that forbearance exists only when the creditor agrees to refrain "during an agreed length of time" from requiring payment. Because during the final arrangement, when the rate exceeded twelve percent, the amount outstanding was payable on demand, Hammel concludes no given period of time existed as part of the contractual agreement. He reasons that the promise of forbearance to him was not adequate consideration flowing his way because the forbearance was subject to Ziegler's whim.

At first glance, the cited forbearance definition seems to compel an answer favoring Hammel. Close examination of *J.C. Penney* and other authorities, however, justifies a different result. The issue in *J.C. Penney* was whether a revolving charge credit arrangement was subject to the usury statutes. Despite the fact that revolving charge accounts have no agreed length of time involved, it was not even at issue in *J.C. Penney,* and the court did not deem it important enough to even parenthetically consider such question before holding that the revolving charge credit did constitute a forbearance. The court instructed that "[i]n cases of alleged usury, [the] court will look through the form of the agreement to the substance." *Id.* at 137, 179 N.W.2d at 647.

---

modification agreement does not relate back and is controlled by the law in effect in 1980.

Reviewing courts are thus not limited to hypertechnical scrutiny of whether the facts of a transaction fit within a mechanical interpretation of the term "forbearance." In a usurious transaction, a lender is charging an interest rate which exceeds the lawful limit. The term "forbearance" simply contemplates a situation where the lender agrees to wait for all or part of the money after it is due. If the parties agree that, in consideration for the delay in payment, the debtor shall pay a usurious rate of interest, Wisconsin law allows this type of agreement if, among other things, the amount of the debt exceeds $150,000. It is not allowed if the debt is less than $150,000, as was the case in *J.C. Penney*. Thus, rather than a mechanical application of the term "forbearance," courts must ask, in each case, whether the forbearance constituted actual consideration. Just because the forbearance promised to Hammel was impeded by the right to unilateral demand for payment, that does not necessarily mean that Ziegler received unilateral benefit and Hammel received nothing for his bargain. A promise to forbear and give further time for the payment of a debt, although no specific time is named, if followed by actual forbearance for a reasonable time, is a valid and sufficient consideration for a promise guaranteeing its payment. *Moore v. McKenney*, 21 A. 749 (Me. 1890).

Here, forbearance is Ziegler's consideration. There was a request for such forbearance. In such a case, it is generally said that a request for forbearance which does not specify the time for which forbearance is requested will be interpreted as requesting forbearance for a reasonable time. 1 S. Williston, A Treatise on the Law of Contracts § 136 (3rd ed. 1957).

Hammel got the benefit of his bargain by getting forbearance for a reasonable time. Forbearance took place until such time as he could pay off the note. Both parties relied on each other's promise: Hammel's—a promise to

pay; Ziegler's—a promise to forbear for a reasonable period of time. Hammel in effect was paying for the continued use of over $150,000 in this case. It cannot be said that the forbearance was only designed to increase Ziegler's profit. Rather, Hammel achieved an abandonment of Ziegler's legal right in the present. He thereby prevented the possible dispossession of his valuable property. Hammel, in return, gave the increased interest rate as an inducement to Ziegler.

We conclude these promises were adequate consideration. Both bound themselves by an obligation and got a benefit in return. That is the essence of a good contract. Therefore, where the forbearance was for a reasonable period of time, it satisfies the definition of forbearance as being for "a given length of time."

*By the Court.*—Judgment reversed.