CICELSKI v SEARS, ROEBUCK & CO

CICELSKI v MONTGOMERY WARD & CO, INCORPORATED

MURPHY v WINKELMAN STORES, INCORPORATED

Docket Nos. 63278-63280. Submitted January 3, 1984, at Detroit.— Decided February 21, 1984. Leave to appeal applied for.

Six class actions were filed in 1970 by John Cicelski and others against Sears, Roebuck & Co., and other retail sales outlets in Wayne Circuit Court alleging that defendants exacted illegal and excessive finance charges pursuant to credit sales agreements. The court, Roland L. Olzark, J., deferred a ruling on the propriety of a class action format and granted partial summary judgment in favor of plaintiffs on the issue of liability. The court specifically held that the previous balance method defendants used in computing finance charges on charge accounts violated a section of the Michgian Retail Installment Sales Act which limits time-price differentials to 1.7% of the unpaid balance per month. Defendants were found to be liable for exacting excessive finance charges from March 10, 1967, until they abandoned the practices in 1971. Defendants appealed by leave granted and the cases were consolidated. On appeal, the Court of Appeals reversed in part the lower court judgment because it was concerned that the costs of calculating and distributing individual damage awards could be grossly disproportionate to the size of those awards and that the costs would ultimately be passed on to defendants' customers. The Court of Appeals remanded for resolution of the class certification question and the presentation of evidence concerning the potential size and administrative costs of possible damage awards, *Grigg v Robinson Furniture Co,* 78 Mich App 712; 260 NW2d 898 (1977). On remand it was determined that the maximum average amount any claimant would receive would be $4.50, that the cost to refund the amounts overcharged to more than one

REFERENCES FOR POINTS IN HEADNOTES.

[1, 2] 59 Am Jur 2d, Parties § 47 *et seq.*

[3] 5 Am Jur 2d, Appeal and Error § 744.

[4] 20 Am Jur 2d, Costs §§ 85, 86.

Attorneys' fees in class actions. 38 ALR3d 1384.

million possible claimants made it unrealistic to do so, that the
effect on the court system would be staggering and that the
primary beneficiaries would be attorneys. The court therefore
declined to certify the consolidated cases as class actions;
rejected plaintiffs' suggestion that the manageability problem
could be avoided by aggregate distribution of the recovery to a
charity or consumer group, a distribution format derived by
analogy to the *cy pres* doctrine of testamentary trusts; and
denied plaintiffs' motion for attorney fees, Roland L. Olzark, J.
Plaintiffs in three of the cases appeal. *Held:*

1. The trial court properly declined to allow distribution of
the recovery according to the fluid recovery or *cy pres* format.

2. Plaintiffs were not entitled to an award of attorney fees.
Affirmed.

1. ACTIONS — CLASS ACTIONS — DISTRIBUTION OF FUNDS — FLUID
   RECOVERY.
   The term "fluid recovery", in the context of class action suits,
   means that, where distribution to the class who should ideally
   receive a fund is impracticable or inappropriate, the distribu-
   tion should be made in the next best fashion in order as closely
   as possible to approximate the intended disposition.

2. ACTIONS — CLASS ACTIONS — DISTRIBUTION OF FUNDS — FLUID
   RECOVERY.
   The mechanism of fluid recovery in class actions seeks to avoid
   manageability problems by use of the following general format:
   (1) the amount of damages incurred by the class as a whole is
   determined in a single adjudication, creating a damage fund; (2)
   individual member claimants capable of proving valid claims
   obtain their share of the fund; and (3) the unclaimed portion of
   the fund is applied to the class's benefit.

3. APPEAL — LAW OF THE CASE.
   The law of the case doctrine holds that if an appellate court has
   passed on a legal question and remanded the case for further
   proceedings the legal questions thus determined by the appel-
   late court will not be differently determined on a subsequent
   appeal in the same case where the facts remain materially the
   same.

4. COSTS — ATTORNEY FEES — CLASS ACTIONS — COMMON FUND.
   Attorney fees generally may not be awarded unless authorized by
   statute or court rule; however, under the "common fund"
   exception attorney fees may be awarded to a party who has

created or protected a common fund for the benefit of others as well as himself.

*Evans & Luptak* (by *D. Michael Kratchman*), for plaintiffs.

*Miller, Canfield, Paddock & Stone* (by *Gilbert E. Gove*), for Sears, Roebuck & Co.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *James W. Collier* and *Susan P. Trigger*), for Montgomery Ward & Co., Incorporated.

*Butzel, Keidan, Simon, Myers & Graham* (by *Richard P. Saslow*), for Winkelman Stores, Incorporated.

Before: CYNAR, P.J., and GRIBBS and M. R. KNOB-LOCK,* JJ.

CYNAR, P.J. This appeal constitutes the legal residue of six consolidated class actions filed in 1970 alleging that defendants, all retail sales outlets, exacted illegal and excessive finance charges pursuant to credit sales agreements. Plaintiffs appeal as of right from an unfavorable disposition below.

Part of plaintiffs' original cause of action was based upon the Michigan Retail Installment Sales Act (MRISA), MCL 445.851 *et seq.;* MSA 19.416(101) *et seq.,* effective March 10, 1967. Section 12 of the act, MCL 445.862; MSA 19.416(112), limited time-price differentials to "1.7% of the unpaid balance per month", and plaintiffs alleged that defendants violated that limitation by using a previous balance method in computing finance charges on their charge accounts. A more complete

---

* Circuit judge, sitting on the Court of Appeals by assignment.

factual background is presented in *Grigg v Robinson Furniture Co,* 78 Mich App 712; 260 NW2d 898 (1977), a prior appeal in this matter.[1]

The trial court in the original action deferred the issue of propriety of the class action format and granted partial summary judgment for plaintiff on the issue of liability. Specifically, the court held that the previous balance method[2] violated § 12 of MRISA and that defendants were liable for the use of that method from the March 10, 1967, effective date of the act until defendants abandoned use of this method in 1971.

Abandonment of the previous balance method came about in this fashion:

"On August 11, 1970, in response to a legislative inquiry, the Attorney General released an opinion concluding that the previous balance method as then employed by the defendants and other retailers violated the maximum rate limitation in § 12 of MRISA. OAG 1969-1970, No. 4706, p 163 (August 11, 1970). The release of that opinion coincided with the filing of the first of the complaints in these consolidated actions. The Attorney General's opinion also sparked a lawsuit in Ingham County Circuit Court by some of these defendants challenging the correctness of that opinion. *Sears, Roebuck & Co v Attorney General,* Ingham County Circuit Court No. 12204-C. That lawsuit was finally ended by a stipulation which (1) reached no conclusion on the legality of the previous balance method, (2) stated that the defendants' use of that method had been in good faith, but that (3) the defendants would switch to the average daily balance method with a 30-day deferral feature as explained in fn 4, *supra.* The defendants switched from the previous balance method to the

---

[1] See also *Grigg v Michigan National Bank,* 72 Mich App 358; 249 NW2d 701 (1976), *rev'd* 405 Mich 148; 274 NW2d 752 (1979), a companion case.

[2] For a brief description of this and other methods of computing finance charges, see *Grigg v Robinson Furniture, supra,* pp 718-719, and accompanying footnotes.

average daily balance method on various dates in 1971." *Grigg, supra,* p 720.

On appeal, the *Grigg* Court disposed of the previous balance issue without addressing its merits:

"The third question posed by this appeal is whether the defendants' use of the previous balance method between March 10, 1967, and late 1971 was in violation of MRISA. The trial judge ruled in the plaintiffs' favor on this point. We are reluctant to express an opinion on this question because we are well satisfied with the terms of the stipulation signed by the Attorney General and several of the defendants. Were we seeking only to determine the fairest system for all parties concerned, the true average daily balance method of computation would be our choice. Because of its finance charge deferral and avoidance features, the hybrid method required by the Attorney General's stipulation is even more favorable to customers. Our resolution of the next issue makes it unnecessary at this time to disturb the stipulated arrangement by expressing an opinion on the validity of the previous balance method under MRISA." (Footnote omitted.) *Grigg, supra,* pp 727-728.

The *Grigg* Court reversed in part the lower court judgment because it was concerned, and legitimately so, that the costs of calculating and distributing individual damage awards could be grossly disproportionate to the size of those awards; the Court was further of the opinion that these costs would ultimately be passed on to defendants' customers. *Grigg, supra,* pp 729-730. The cause was remanded for resolution of the class certification question and the "presentation of evidence concerning the potential size and administrative costs of possible damage awards". *Grigg, supra,* pp 731-732.

On remand, the parties[3] engaged in further discovery and ultimately agreed on a description of the average damage claim. Plaintiffs did not contest defendants' evidence concerning costs associated with effecting refunds to potential class members. In an opinion issued October 19, 1981, the trial court made these findings:

"1. The number of possible claimants in this class action exceeds one million.

"2. The maximum average amount any claimant would receive is $4.50.

"3. The cost per account to determine if a claimant has paid any excess finance charge would be as follows:

| | |
|---|---|
| Winkelman's | $78.54 |
| Sears | $50.23 |
| Montgomery Ward | $60.94 |

"4. That the total cost of conducting this analysis would be as follows:

| | |
|---|---|
| Winkelman's | $8,816,386.00 |
| Wards | $21,329,000.00 |
| Sears | $52,273,750.00 |

"5. That in addition to these expenses there would be an enormous expense for other items in processing this claim such as notice to the claimants and attendant mailing and printing costs.

"6. That plaintiffs have indicated they are unwilling to pay the costs of notices.

"7. That the aggregate amount to be refunded to the claimants would be approximately one million dollars as indicated by the plaintiff.

"8. That the effect on this court system would be staggering.

"9. That the primary beneficiary of these proceedings would most likely be the attorneys thru fees."

Based upon this bleak assessment, the court

[3] As a result of settlement agreements involving Robinson Furniture Co., E. J. Korvette and Federals, the original six consolidated cases were reduced to three.

declined to certify the consolidated cases as class actions. The court rejected plaintiffs' suggestion that the manageability problem could be avoided by aggregate distribution of the recovery to a charity or consumer advocacy group, a distribution format derived by analogy to the *cy pres* doctrine of testamentary trusts. The court further denied plaintiffs' motion for attorney fees.

Plaintiffs' first contention in these appeals is that the trial court should have allowed distribution of the recovery according to the fluid recovery or *cy pres* format. Upon due consideration, we are convinced that the court properly declined to employ this recovery mechanism.

The terms *"cy pres"* and "fluid recovery", in the context of class action suits, have been employed interchangeably[4] and embrace this central concept: "[T]hat where distribution to the class who should ideally receive a fund is impracticable or inappropriate, the distribution should be made in the 'next best' fashion in order as closely as possible to approximate the intended disposition." *In re Folding Carton Antitrust Litigation,* 557 F Supp 1091, 1108 (ND Ill, 1983). The fluid recovery mechanism seeks to avoid manageability problems by use of the following general format: (1) the amount of damages incurred by the class as a whole is determined in a single adjudication, creating a damage fund; (2) individual member claimants capable of proving valid claims obtain their share of the fund; and (3) the unclaimed portion of the fund is applied to the class's benefit. *In re Federal Sky-*

---

[4] By suggesting that we reject a *cy pres* distribution merely because a testamentary trust is not involved in this appeal, defendants are playing word games with the Court. The use of the term *"cy pres"* indicates at best that fluid recovery is an analogue sharing common features with the *cy pres* trust doctrine, but in the context of class actions it is an independent concept.

*walk Cases,* 680 F2d 1175, 1189, fn 14 (CA 8, 1982) (Heaney, J., *dissenting).* The third procedural characteristic above is the actual fluid recovery, and it commonly assumes one of two forms. The remainder of the fund is either distributed through the market, "usually in the form of a reduced charge for an item the defendant previously overpriced", or it is "given to the state to use on a project likely to be of interest to class members or, if that is not possible, for general purposes". (Footnotes omitted.) Note, *Developments in the Law—Class Actions,* 89 Harv L Rev 1318, 1522 (1976). See *Bebchick v Public Utilities Comm,* 115 US App DC 216; 318 F2d 187, 203-204 (1963), *cert den* 373 US 913; 83 S Ct 1304; 10 L Ed 2d 414 (1963); *West Virginia v Chas Pfizer & Co,* 440 F2d 1079 (CA 2, 1971), *cert den sub nom Cotler Drugs, Inc v Chas Pfizer & Co,* 404 US 871; 92 S Ct 81; 30 L Ed 2d 115 (1971).[5]

Defendants urge peremptory disposition of the issue based upon the law of the case doctrine because this Court in *Grigg* expressed disapproval of the fluid recovery mechanism. This is what was said in the prior appeal:

"We reject any suggestion that the computation difficulties can be avoided by employing some variation of the 'fluid class' concept. That idea was emphatically rejected by the Second Circuit Court of Appeals in *Eisen v Carlisle & Jacquelin,* 479 F2d 1005 (CA 2, 1973). And while that decision does not control an interpretation of GCR 1963, 208, we are persuaded by its reasoning." *Grigg, supra,* pp 729-730, fn 12.

The law of the case doctrine holds that, if an

[5] This is an esoteric corner of the law, but it does not want for authoritative comment. See, *e.g.,* Comments, *Due Process and Fluid Class Recovery,* 53 Or L Rev 225 (1974); Malina, *Fluid Class Recovery as a Consumer Remedy in Antitrust Cases,* 47 NY U L Rev 447 (1972).

appellate court has passed on a legal question and remanded the case for further proceedings, the legal questions thus determined by the appellate court will not be differently determined on a subsequent appeal in the same case where the facts remain materially the same. *CAF Investment Co v Saginaw Twp,* 410 Mich 428; 302 NW2d 164 (1981); *Thomas Bros, Inc v Secretary of State (After Remand),* 107 Mich App 805; 310 NW2d 249 (1981), *lv den* 417 Mich 938 (1983). In this case the *Grigg* Court was quite specific concerning which issues were squarely before it, and the propriety of a fluid recovery was not one of them. The *Grigg* footnote was therefore dicta, to which the law of the case doctrine does not apply.

We further believe that the *Grigg* Court was somewhat hasty in its condemnation of the fluid recovery idea. Indeed, the statement by the *Grigg* Court that it found *Eisen's* reasoning persuasive is mysterious because the *Eisen* Court did not explain why it found fluid recovery offensive to due process. See *Eisen,* 479 F2d 1018.[6] Fluid recovery was also rejected in *Windham v American Brands, Inc,* 565 F2d 59 (CA 4, 1977), but that Court merely parroted *Eisen's* conclusions that the method was " 'illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper' ". *Windham, supra,* p 72, citing *Eisen, supra.* Speculating that *Eisen's* due process concerns might center around the aggregate damage determination, at least one authoritative comment has found such an argument uncompelling:

"The nature of the due process argument is not clear. Because of the constraints of substantive law, class-wide

[6] *Eisen* was vacated and remanded by the Supreme Court, 417 US 156; 94 S Ct 2140; 40 L Ed 2d 732 (1974), but the issue concerning fluid recovery's propriety or legality was not reached.

calculation of damages would be inappropriate where the class opponent has defenses that he could assert against class members on an individual basis. In the absence of such necessarily individualized inquiries, however, the class opponent hardly seems prejudiced by being restricted to only one hearing on common issues. Even though the calculation of damages might involve issues on which a hearing would ordinarily be required by due process, it has never been thought that due process required multiple hearings where there was one full and fair adjudication of the merits." (Footnote omitted.) Note, *Developments, supra,* pp 1524-1525.

Because *Eisen* does not convince us of the existence of an inherent constitutional defect in the fluid recovery format, we are attracted to the reasoning of the Court in *Simer v Rios,* 661 F2d 655 (CA 7, 1981), *cert den* 456 US 917; 102 S Ct 1773; 72 L Ed 2d 177 (1982), which suggested an ad hoc determination of the format's appropriateness. The *Simer* Court said:

"We need not adopt either of the two extreme positions—that is, whether a fluid recovery always can be used to surmount problems in the going forward of a class action or whether a fluid recovery is per se unconstitutional. Rather, we believe that a careful case-by-case analysis of use of the fluid recovery mechanism is the better approach. In this approach we focus on the various substantive policies that use of a fluid recovery would serve in the particular case. The general inquiry is whether the use of such a mechanism is consistent with the policy or policies reflected by the statute violated. This matter can be more particularized into an assessment of to what extent the statute embodies policies of deterrence, disgorgement, and compensation." (Footnotes omitted.) *Simer, supra,* p 676.

This warrants a fresh consideration of MRISA, and the principal thrust of that act's enforcement provision is clearly deterrence. Section 19 of

MRISA, MCL 445.869; MSA 19.416(119), grants the attorney general or the prosecuting attorney in the county where a violation occurs the ability to seek injunctive relief. If the violation is wilful and intentional, the offender is guilty of a misdemeanor per § 17, MCL 445.867; MSA 19.416(117). Section 18 provides in part:

"Any seller who enters into any contract or agreement which does not comply with the provisions of this act or who violates any provision of this act except as a result of accidental or bona fide error is barred from the recovery of any time price differential, any official fees, delinquency or collection charge, attorney fees or court costs and the buyer shall be entitled to recover his reasonable attorney fees and court costs from the seller or his assigns." MCL 445.868; MSA 19.416(118).

This section, preventing an overcharging seller from recovering *any* time-price differential, is punitive and hence a deterrent. So is the misdemeanor charge in § 17. Absent is any statutory emphasis on compensation or disgorgement. In this case, therefore, the justification for employment of the fluid recovery mode would have to be hung almost entirely on its deterrent value. This singular deterrent purpose would tip the balance in favor of fluid recovery, if at all, only "where the danger of overdeterrence or excessive punishment through private enforcement is low: for example, where the substantive law is quite clear, where deterrence of borderline conduct would not cause any serious consequences, or where good-faith violations are exempt from coverage". Note, *Developments, supra,* pp 1527-1528.[7] This is not such a

---

[7] This statement was made in the context of a hypothetical statute showing a "deep concern" for both deterrence and disgorgement, *a fortiori* it applies, perhaps more forcefully, where only a deterrent intent is displayed. Note, *Developments, supra.*

case. Although no appellate court has determined the question of whether defendants were in violation of § 12 of MRISA,[8] it has been determined that any violation was made in good faith. On this point, the *Grigg* Court left no room for dispute:

"The trial judge found—and the Attorney General stipulated—that the defendants' use of the previous balance method was done in the good faith belief that it was legal in Michigan. We affirm that finding. This is not a situation like *Hays v Regents of University of Michigan,* 393 Mich 756; 233 NW2d 276 (1974), in which the defendant should have been alerted to the clear illegality of its practices by earlier court decisions. In the present case, the most that can be said is that there is a split of opinion among the state and Federal courts which have considered the legality of the previous balance method under statutes similar to MRISA. Contrast *Haas v Pittsburgh National Bank,* 526 F2d 1083 (CA 3, 1975), and *Partain v First National Bank of Montgomery,* 467 F2d 167 (CA 5, 1972), with *Zachary v R H Macy & Co,* 31 NY2d 443; 340 NYS2d 908; 293 NE2d 80 (1972); *Seibert v Sears, Roebuck & Co,* 45 Cal App 3d 1; 120 Cal Rptr 233 (1975); *Federated Dep't Stores, Inc v Pasco,* 275 So 2d 46 (Fla App, 1973); *Johnson v Sears, Roebuck & Co,* 14 Ill App 3d 838; 303 NE2d 627 (1973)." *Grigg, supra,* p 729.

In summary, the policies of compensation and disgorgement are not applicable and weigh against fluid recovery. *Simer, supra,* p 677. Additionally, because defendants acted in good faith, fluid recovery may not be justified solely as a deterrent even though MRISA has a deterrent purpose.[9] For these reasons we uphold the trial court's refusal to invoke the fluid recovery method in this case.

---

[8] Nor do we do so.

[9] A fair reading of the enforcement provisions, *supra,* indicates that they are not fully invoked unless the perpetrator's act was intentional and deliberate.

Plaintiffs argue that they are entitled to an attorney fee award despite the fact that no recovery was distributed. Generally, no attorney fees may be awarded unless authorized by statute or court rule. *GRP, Ltd v United States Aviation Underwriters, Inc,* 70 Mich App 671; 247 NW2d 583 (1976), *aff'd* 402 Mich 107; 261 NW2d 707 (1978). However, under the "common fund" exception attorney fees may be awarded to a party who has created or protected a common fund for the benefit of others as well as himself. *In the Matter of Attorney Fees of Kelman, Loria, Downing, Schneider & Simpson,* 406 Mich 497; 280 NW2d 457 (1979); *Foremost Life Ins Co v Waters (On Remand),* 125 Mich App 799, 805; 337 NW2d 29 (1983). One of the requisites for a fee award is successful maintenance of the suit by plaintiff. *Kelman, supra,* pp 503-504, citing *Mills v Electric Auto-Lite Co,* 396 US 375, 391-392; 90 S Ct 616; 24 L Ed 2d 593 (1970). Since in this case there is no recovery, we do not view such a suit as successful, nor do we perceive a direct benefit to the class.[10] We conclude that plaintiffs were not entitled to an attorney fee award.

Affirmed.

[10] It is not impossible that the filing of these suits may have contributed to the cessation of the "previous balance" practice by defendants. However, such is more likely the product of the Attorney General's involvement, beginning with OAG, 1969-1970, No 4706, p 163 (August 11, 1970), which concluded that the previous balance method violated the maximum rate limitation in § 12 of MRISA.